UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RUTH HAMILTON,

                Plaintiff,

      v.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

<u>DECISION & ORDER</u>

12-CV-6291P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Ruth Hamilton ("Hamilton") brings this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for supplemental security income ("SSI").

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 9, 11). Oral argument on the parties' motions was conducted on April 3, 2013. (Docket # 18).

For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Accordingly, the Court hereby grants the Commissioner's motion for judgment on the pleadings.

_____

[1] After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.

## PROCEDURAL HISTORY

On December 17, 2009, Hamilton filed an application for SSI, claiming disability since January 12, 2004, for obesity, disc disease of the cervical spine, chronic low back pain, a left foot injury, asthma, migraine headaches, gastroesophageal reflux disease and mental health issues. (Tr. 10, 12, 153-55).[2] Hamilton's claim was denied on March 31, 2010. (Tr. 87-91). At Hamilton's request, an administrative hearing was conducted on January 11, 2011 in Corning, New York before Administrative Law Judge F. Patrick Flanagan (the "ALJ"). (Tr. 27). Hamilton, who was represented by attorney Janet Russo, testified at the hearing. (Tr. 27-92).

On April 15, 2011, the ALJ issued a decision finding that Hamilton was not disabled under the Act. (Tr. 10-20). Hamilton requested review of the ALJ's decision, and the Appeals Council denied Hamilton's request on May 9, 2012. (Tr. 1-4). This action followed.

## FACTUAL BACKGROUND

### I.     Relevant Non-Medical Evidence

Hamilton was born on May 1, 1979 and is now 34 years old. (Tr. 163). She graduated from high school in 1997. (Tr. 175). She also attended some college courses, but did not obtain an degree. (Tr. 33-34). Hamilton's previous work history includes employment as a cashier, a certified nursing assistant, a factory worker and an office worker. (Tr. 169). Hamilton has not been employed since approximately September 18, 2007. (Tr. 168).

At the time Hamilton applied for disability benefits, she lived with her boyfriend. (Tr. 177). Hamilton reported that her disabilities included back problems (including a herniated

---

[2]   The administrative transcript shall be referred to as "Tr. __."

disk), bi-polar disorder, severe anxiety, severe depression, chronic migraines, fibromyalgia and insomnia.  (Tr. 168).  Hamilton reported that her daily activities included taking her medications, getting dressed, watching television, picking up the house, eating, showering and relaxing. (Tr. 178).  Hamilton indicated that she is able to perform her own personal hygiene.  (*Id.*).  She also reported that she has difficulty sleeping due to both pain and anxiety.  (*Id.*).  She indicated that she can prepare quick, simple meals on a daily basis.  (Tr. 179).  According to Hamilton, she can complete smaller chores around the house, but her boyfriend must assist with any chores that require standing for a period of time.  (Tr. 180).

Hamilton reported that she is overwhelmed in stores, but is able to pay bills, count change, handle a savings account and a checkbook.  (Tr. 181).  According to Hamilton, she no longer socializes with her friends or family and does not often leave the house.  (Tr. 181-82).  In addition, Hamilton reported that she lost custody of her children because of her mental instability.  (Tr. 178).  She reports that she is easily annoyed and has mood swings.  (Tr. 182). She indicated that she does not have problems interacting with persons in positions of authority and that she has never lost a job due to her inability to interact with others, but noted that she has difficulty controlling her emotions when she is stressed.  (Tr. 184).

With respect to her migraines, Hamilton reported that recently she had been experiencing daily migraines and estimates that she has approximately 20 every month or approximately 4-5 per week.[3]  (Tr. 193).  She usually experiences throbbing pain that dissipates with medication.  (*Id.*).  With severe migraines, she is sensitive to light, smells and sounds, must stay alone in a dark room and may experience nausea and vomiting.  (Tr. 194).  According to

[3]  It is unclear from the record when this report was completed by Hamilton.

Hamilton, she seeks treatment at the emergency room for very bad migraines.  (*Id.*).  She takes

Topamax twice daily to control her migraines and takes Excedrin to manage the pain.  (*Id.*).

On April 14, 2010, Hamilton updated her disability report with additional

information.  (Tr. 198-205).  She indicated her boyfriend sometimes has to help her dress

because of her back pain.  (Tr. 202).  She also indicated that she could no longer perform any

household chores and that she could not stand long enough to wash dishes.  (Tr. 204).

II.   **Relevant Medical Evidence**

A.   **Mental Health Treatment at Family Services Mental Health Clinic**

In September 2008, Hamilton began treatment with Family Services Mental

Health Clinic ("Family Services").  (Tr. 288-93).  The intake evaluation indicates that Hamilton

reported four previous incidents of mental health inpatient treatment.  (Tr. 288).  Three of those

incidents occurred in 2003 and one in 2006.  (*Id.*).  Hamilton reported symptoms of anxiety and

panic attacks, and indicated that she was seeking treatment for depression, anxiety, stress,

insomnia, obsessive compulsive disorder and an eating disorder.  (*Id*.).  At that time, she was

assessed as a priority 2 patient, indicating that she required "rescheduling within two weeks of

initial intake evaluation."  (Tr. 291, 293).  She was assessed a Global Assessment Functioning

("GAF")[4] score of 50, indicating serious symptoms or a serious impairment in social,

---

[4]  GAF refers to the Global Assessment of Functioning, a numeric scale (0 through 100) used by mental
health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults,
*i.e.*, how well or adaptively patients are meeting various problems-in-living.  *See Diagnostic and Statistical Manual
of Mental Disorders*, 4th Ed., Text Revision ("DSM-IV-TR"), at 34.  A GAF of 100 represents optimal functioning.
A GAF in the range of 41-50 indicates that the patient is presenting serious symptoms (*e.g.*, suicidal ideation, severe
obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning
(*e.g.*, no friends, unable to keep a job).  *Id.*

occupational or school functioning.  (*Id.*).  Staff therapist Kristen Fields, M.A., ("Fields")
conducted a mental examination of Hamilton and diagnosed her with major depressive disorder,
recurrent moderate and obsessive compulsive disorder.  (Tr. 291).

Hamilton presented to Family Services again on October 3, 2008, November 7,
2008, and January 13, 2009.  (Tr. 283, 276, 271).  At her January 13, 2009 appointment,
Hamilton complained of anxiety to staff therapist Angela J. Renzo, B.S., ("Renzo"), who
recommended Hamilton seek medication from her primary care doctor.  (Tr. 271).  In April 2009,
Hamilton presented to Family Services indicating that she felt "very overwhelmed."  (Tr. 265).
In May 2009, Hamilton returned to Family Services stating that she was planning to start school
at the end of the month and was looking forward to being out of the house more.  (Tr. 263).

After a series of missed appointments and Hamilton's lack of response to outreach
attempts, Family Services closed Hamilton's case on September 2, 2009.  (Tr. 259-63).  The
discharge was "unsatisfactory" because Hamilton had not completed therapy, her GAF at
discharge was 50 and none of her treatment goals were met.  (Tr. 286).

**B.**     **Hamilton's Treatment with Nurse Practitioner Darlene Baltimore**

Between May and November 2009, Hamilton met with Nurse Practitioner Darlene
Baltimore ("NP Baltimore") eleven times for various complaints including cough, diarrhea and
skin rashes.  (Tr. 433-37, 440-42).

In December 2009, Hamilton met with NP Baltimore complaining of back pain.
(Tr. 314).  The following month, Hamilton met with NP Baltimore again, indicating that she
could not work due to her back pain and requesting that NP Baltimore fill out paperwork for her.
(Tr. 315).  At that time, Hamilton reported that Lyrica was helping with her pain, but she wanted

an increased dose. (*Id.*). NP Baltimore conducted an examination of Hamilton, noting that Hamilton was slow to change position due to the back pain and that she had tenderness over her lumbar region. (*Id.*). On January 12, 2010, NP Baltimore completed a medical examination of Hamilton, assessing that Hamilton's ability to sit was not limited, her ability to use her hands was moderately limited, and her ability to walk, stand, lift, carry, push, pull, bend, see, hear, speak, and climb stairs was very limited. (Tr. 312). In addition, NP Baltimore found no evidence of limitations of mental functioning, but noted that Hamilton was "emotionally unstable." (Tr. 312-13).

On March 11, 2010, Hamilton met with NP Baltimore complaining of lumbosacral pain. (Tr. 430). On March 31, 2010, Hamilton met with NP Baltimore complaining of low back pain. (*Id.*). NP Baltimore assessed that Hamilton had chronic low back pain, lumbar strain, anxiety and low potassium. (Tr. 429). She referred Hamilton for an MRI of the lumbar spine and prescribed Darvocet for the pain. (*Id.*).

In July 2010, Hamilton visited NP Baltimore complaining of a rash on her arms, neck and lower extremities. (Tr. 428). NP Baltimore diagnosed Hamilton with poison ivy. (*Id.*). On August 9, 2010, Hamilton met with NP Baltimore complaining of leg pain and requesting to have disability paperwork filled out. (Tr. 424, 426). NP Baltimore noted that Hamilton was not mentally limited from working. (Tr. 426).

On November 8, 2010, Hamilton, who had suffered a leg injury after having fallen into a hole in the street in April 2010, underwent a functional assessment at Elmira Orthopedics at the request of NP Baltimore. (Tr. 469-77). The assessing therapist diagnosed Hamilton with chronic left foot pain and chronic back pain and determined that Hamilton could tolerate sitting,

but should stand at her own discretion to limit discomfort in the low back. (Tr. 479, 475). The therapist noted that Hamilton's goal was to find a clerical position and that her physical limitations for walking long distances, lifting below the waist, forward bending while standing, and kneeling would likely be minimal in an office setting. (Tr. 475). The therapist noted Hamilton's "abilities . . . would make working in an office setting . . . possible." (*Id.*).

C. **Hamilton's Treatment with Michael Schuman, M.D. & Testing Related to Hamilton's Headaches**

In June 2009, Hamilton met with Michael Schuman, M.D., ("Dr. Schuman") complaining of "recurrent and frequent headaches." (Tr. 305). Hamilton reported that she began experiencing headaches after a motor vehicle accident in January 2004. (*Id.*). Dr. Schuman conducted neurologic, motor and sensory examinations of Hamilton, all of which were normal. (Tr. 306). Dr. Schuman diagnosed Hamilton with post-traumatic headache disorder, but not migraines. (*Id.*).

In June 2009, Hamilton underwent a neurological electroencephalogram, which was normal. (Tr. 311). The following month, Hamilton underwent an MRA of her head and an MRI of her brain, both of which revealed no abnormalities. (Tr. 230, 309). At a follow-up visit on July 8, 2009, Dr. Schuman opined that Hamilton was neurologically stable, did not need further testing and "should function without restriction." (Tr. 304).

In October 2009, Hamilton met with Dr. Schuman, reporting several moderately severe headaches during that past week, for which she did not take medication. (Tr. 303). Dr. Schuman opined that Hamilton was doing reasonably well and that her headaches should be treated as conservatively as possible. (*Id.*).

D. **Hamilton's Visits to the Emergency Room**

On August 26, 2009, Hamilton visited the emergency room (the "ER") for right upper quadrant pain. (Tr. 239-45, 247-50). On November 3, 2009, Hamilton visited the ER for abdominal pain and was diagnosed with acute abdominal pain and discharged. (Tr. 232-37, 251-53, 256).

On June 30, 2010 and July 20, 2010, Hamilton visited the ER complaining of a rash on her arms. (Tr. 596-608, 609-22).

On September 5, 2010, Hamilton visited the ER complaining of pain in the rectal area and bleeding. (Tr. 623-44). A CT scan of the abdomen and pelvis revealed a fatty liver and "no acute findings." (Tr. 712).

On January 6, 2011, Hamilton visited the ER complaining of abdominal and chest pain. (Tr. 734-54). She returned to the ER on January 16, 2011 complaining of a headache with vomiting and was diagnosed with migraine headache. (Tr. 755-69, 767).

E. **Hamilton's Mental Consultative Examination by Sara Long, Ph.D.**

On February 4, 2010, state examiner Sara Long, Ph.D., ("Dr. Long") completed a psychiatric evaluation of Hamilton. (Tr. 372-76). During the evaluation, Hamilton reported that she had a history of psychiatric hospitalizations. (Tr. 372). Three of those hospitalizations occurred in 2003 and were related to her children being removed from the home. (*Id.*). The last hospitalization occurred in 2006 and was likewise related to her feelings regarding the adoption of her children. (*Id.*). According to Hamilton, she was not currently receiving mental health treatment. (*Id*). Hamilton reported that she graduated high school, had earned college credits and was "just short of a certificate in office work." (*Id.*). Hamilton also reported that she could

perform her own personal hygiene.  (Tr. 374).  In addition, she indicated that she could prepare

meals and perform household chores, but that she needed assistance due to pain in her back, neck

and hands.  (*Id.*).

Upon examination, Dr. Long opined that Hamilton had normal speech, coherent

and goal-directed thought processes, full range affect, euthymic mood, clear sensorium, intact

attention, concentration and memory, and average cognitive functioning.  (Tr. 373-74).  Dr. Long

assessed that Hamilton's insight was poor and her judgment was poor to fair.  (Tr. 374).

According to Dr. Long, Hamilton could follow and understand simple directions and instructions

and perform simple tasks independently, maintain attention and concentration and a regular

schedule, learn new tasks, perform complex tasks independently, make appropriate decisions

within context, relate adequately with others, and had adequate stress management skills.

(Tr. 374-75).  Dr. Long indicated that the results of her evaluation appear "consistent with

psychiatric problems which appear to interfere with [Hamilton's] ability to function on a regular

basis."  (Tr. 375).  According to Dr. Long, Hamilton's prognosis was good with psychotherapy

and vocational counseling.  (Tr. 376).

      **F.**      **Hamilton's Internal Medicine Consultative Examination by Justine Magurno, M.D.**

On March 9, 2010, state examiner Justine Magurno, M.D., ("Dr. Magurno")

conducted an internal medicine consultative examination of Hamilton.  (Tr. 378-88).  During the

examination, Hamilton reported that she had low back pain that limited her ability to do

household chores and to sit and stand for extended periods of time.  (Tr. 378).  In addition,

Hamilton reported neck pain that caused her to have migraines. (*Id.*). According to Hamilton, the migraines occurred four times per week and lasted between one hour and five hours. (*Id.*).

Upon examination, Dr. Magurno assessed that Hamilton had right antalgic gait, could stand on her toes with difficulty, could not stand on her heels and squatted half-way. (Tr. 380). She noted that Hamilton used no assistive devices, did not need help changing for the examination or getting on and off the examination table, and could rise from a chair without difficulty. (*Id.*). Dr. Magurno noted that Hamilton had limited range of motion in the cervical and lumbar spine, positive supine straight leg raising at 30 degrees on the right and 60 degrees on the left, and limited right-side hip and knee range of motion due to back pain. (Tr. 381-82). A lumbosacral spine x-ray showed a transitional L5 vertebral body, but was otherwise unremarkable. (Tr. 384). Dr. Magurno noted that Hamilton had full strength in the upper and lower extremities, full grip strength, and intact hand and finger dexterity. (Tr. 382). According to Dr. Magurno, Hamilton had moderate limitations for walking, standing, pushing, and pulling, mild limitations for sitting due to self-reported parathesia, mild limitations for reaching, and no limitations for fine motor activities, speech, or hearing. (Tr. 383). In addition, Dr. Magurno opined that Hamilton would have moderate schedule disruptions due to her migraines. (*Id.*).

G.      **Hamilton's Psychiatric Evaluation with Dr. V. Reddy**

On March 25, 2010, agency medical consultant Dr. V. Reddy ("Dr. Reddy") completed a psychiatric review technique form ("PRTF") and mental residual functional capacity assessment ("MRFCA"). (Tr. 385-403). In the PRTF, Dr. Reddy assessed that Hamilton had mild limitations in her activities of daily living, mild difficulties in social functioning and

moderate difficulties maintaining concentration, persistence and pace. (Tr. 395). In the

MRFCA, Dr. Reddy assessed that Hamilton could perform unskilled work. (Tr. 401, 403).

**H.**     **Hamilton's Visits to ER for Left Ankle and Foot Pain and Related Care**

On April 15, 2010, Hamilton presented to the ER after twisting her left ankle and

foot. (Tr. 523-40). An X-ray revealed irregularity at the medial aspect of the navicular with soft

tissue swelling. (Tr. 717). Hamilton was diagnosed with a sprained left ankle. (Tr. 536).

Hamilton returned to the ER three days later complaining of continued swelling and increased

pain. (Tr. 547, 550). She returned to the ER again on April 21, 2010 for the continued swelling

and the ER assessed possible navicular fracture and prescribed Percocet. (Tr. 555, 562).

On April 22, 2010, Hamilton met with Peter Remec, M.D., ("Dr. Remec") for

follow-up care of her left foot. (Tr. 458). X-rays performed the day before revealed soft tissue

swelling and possible fibular tip fracture. (Tr. 462-63). Dr. Remec diagnosed Hamilton with a

sprained left foot with possible navicular fracture and recommended a walking boot. (Tr. 458).

A CT scan performed several days later revealed soft tissue swelling, but was otherwise normal.

(Tr. 461). At a subsequent follow-up visit on May 4, 2010, Dr. Remec recommended physical

therapy and discontinued use of the walking boot. (Tr. 457). Hamilton began physical therapy

shortly thereafter, but ceased treatment on June 10, 2010 because her leg was in a cast.

(Tr. 504-22, 509).

On May 27, 2010, Hamilton presented to the ER complaining of left ankle pain

with increased swelling and was prescribed Vicodin. (Tr. 577).

In June 2010, Hamilton met with Beth Dollinger, M.D., ("Dr. Dollinger") for

follow-up care of her left foot. (Tr. 453). X-rays performed that day were negative, and Dr.

Dollinger assessed that Hamilton did not appear to have any ligament injury. (*Id.*). Dr. Dollinger put Hamilton in a non-weight bearing cast for four weeks and noted that Hamilton might be suffering from acute disuse syndrome. (*Id.*).

On August 9, 2010, Hamilton met with Dr. Remec, who ordered physical therapy for Hamilton and assessed that she could fully bear weight on her foot and pursue any desired activities. (Tr. 455). Hamilton attended physical therapy later that month, but discontinued it the following day. (Tr. 496-502).

On September 8, 2010, Hamilton had a follow-up appointment with Dr. Dollinger, at which time she complained of pain in her left foot and inability to walk. (Tr. 451). Dr. Dollinger performed an examination of Hamilton's left foot, which revealed no abnormalities. (*Id.*). Dr. Dollinger stated that she was "unclear what is going on with [Hamilton]" and noted that "[Hamilton] seems to be pursuing Social Security Disability." (*Id.*).

Left foot and ankle x-rays performed in November 2010 revealed "no fracture or other significant bony abnormalities." (Tr. 707-08).

I.  **Hamilton's Medical Assessments Conducted By Paul Povanda, M.D.**

In January 2011, Paul Povanda, M.D., ("Dr. Povanda") completed medical source statements regarding Hamilton's physical and mental functioning. (Tr. 443-50). Dr. Povanda opined that Hamilton could sit for less than six hours out of an eight-hour day and needed to alternate positions between sitting and standing. (Tr. 443). He also opined that Hamilton could not stand for two hours in an eight-hour workday and could lift over ten pounds up to three hours a day. (Tr. 444). According to Dr. Povanda, Hamilton's condition had a "severe" effect on her ability to concentrate and sustain a work pace. (*Id.*).

With respect to Hamilton's mental functioning, Dr. Povanda opined that Hamilton had marked limitations in her ability to concentrate for extended periods of time, perform activities within a schedule, maintain regular attendance and be punctual, complete a normal work day and work week without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to ordinary stressors in a work setting. (Tr. 447-48).

On April 16, 2011, Dr. Povanda completed a medical source statement assessing that Hamilton's ability to sit, see, hear, speak, and use her hands was not limited, her ability to walk and stand was moderately limited, and her ability to lift, carry, push, pull, bend and climb was very limited. (Tr. 771-72). Dr. Povanda opined that Hamilton's ability to understand, remember, and carry out instructions, maintain attention and concentration, and maintain socially appropriate behavior was moderately limited, and her ability to function in a work setting at a consistent pace was very limited. (Tr. 772). Counsel for Hamilton submitted this assessment to the Appeals Council in connection with Hamilton's request for review of the ALJ's determination. (Tr. 4).

## II.   **Relevant Testimonial Evidence**

At her administrative hearing, Hamilton testified that she was 31 years old, was 5'1" and weighed 230 pounds. (Tr. 32). She testified that she was married, but separated from her husband. (Tr. 33). She currently lives with her boyfriend and, although she has two children, they were adopted by another family. (*Id.*). Hamilton testified that she graduated high school and attended college, but did not obtain a degree. (Tr. 33-34). According to Hamilton, she is

currently working two days a week for four to eight hours doing office work in exchange for public assistance. (Tr. 34-36). She testified that she had previously worked full-time for the Census in 2000 until that work ended, performing sit-down work that required some lifting and carrying. (Tr. 37-38). She also worked as a cashier, generally in a standing position, though she was allowed to sit when she was pregnant. (Tr. 38-41). Hamilton testified that although she applied for jobs as a requirement of obtaining public assistance, she could not perform one if she were hired. (Tr. 43-44).

Hamilton testified further that she could not work due to her anxiety and back and foot problems. (Tr. 44). According to Hamilton, she experienced sleeplessness and crying spells in anticipation of the hearing. (*Id.*). Hamilton also testified that she suffers from panic attacks lasting approximately five minutes about once a month. (Tr. 71). In addition, she indicated that she suffers from depression, which affects her motivation and energy level and causes her to isolate herself. (Tr. 71-72). She stated that she stopped mental health treatment at Family Services because she did not like the treatment. (Tr. 45). According to Hamilton, the staff at Family Services did not listen to her and prescribed medications as a solution to her concerns. (*Id.*). She also testified that she talked to NP Baltimore about her mental issues and that NP Baltimore listened to her and gave her the medicine she needed. (Tr. 46). Plaintiff testified that she always saw NP Baltimore and had seen Dr. Povanda only once when he completed her disability paperwork. (Tr. 47).

She testified that she visited a chiropractor after she was involved in a motor vehicle accident in 2004, but recently had no treatment for her back other than pain medication. (Tr. 48-50). Hamilton indicated that she had a headache at the hearing and has them daily.

14

(Tr. 51).  In response to questioning from the ALJ, however, Hamilton conceded that while she had experienced daily headaches in the last week, over the course of the past year she had only experienced on average two or three per month.  (*Id.*).  She testified further that she could usually control her headaches, but she had been to the emergency room for her headaches four or five times in the past year.[5]  (Tr. 52).  She wore a walking boot for her foot and testified that she typically used a wheelchair and a walker, but she did not bring either device to the hearing because there was not enough room in the vehicle.  (Tr. 53-55).

Regarding her functional abilities, Hamilton testified that she could sit for thirty minutes, stand for approximately five minutes, walk for approximately five minutes and lift and carry about five pounds.  (Tr. 60-63).  According to Hamilton, she navigates her home without a wheelchair, but typically uses the wheelchair outside of the home.  (Tr. 55).  Hamilton testified that she currently takes Topamax, Nexium, Singulair, Claritin, Amitriptyline, Seroquel and Flexeril for her impairments.  (Tr. 57).  According to Hamilton, the Flexeril causes drowsiness and fatigue, although it does provide some relief.  (Tr. 59, 63-64).  Hamilton testified that she has difficulty sleeping at night due to racing thoughts.  (Tr. 64).  She also reported experiencing compulsions regarding the number of time she sips her drink and requires that "everything [be] done a certain way."  (Tr. 65).

With respect to her daily activities, Hamilton testified that her anxiety inhibits her from going places, but she admitted that she goes grocery shopping.  (Tr. 66).  She also attends work and "job search" as a condition of her receipt of public assistance.  (Tr. 67).  She no longer

---

[5]  As noted by the ALJ, Hamilton's medical records reflect only one emergency room visit relating to headaches.  (Tr. 17, 755-69).

associates with her friends, but enjoys listening to music. (*Id.*). Hamilton testified that she has difficulty completing household chores. (Tr. 62-63). In addition, although she can shower and wash her hair unassisted, she must sit down to complete her personal hygiene due to her back pain. (Tr. 63).

## DISCUSSION

I. **Scope of Review**

42 U.S.C. § 405(g) directs the Court to accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938). The Court's scope of review is limited to whether the Commissioner's findings were supported by substantial evidence in the record and whether the Commissioner employed the proper legal standards in evaluating the plaintiff's claim. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (a reviewing Court does not try a benefits case *de novo*).

Judgment on the pleadings pursuant to Rule 12(c) may be granted "where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). If, after reviewing the record, the Court is convinced that the plaintiff has not set forth a plausible claim for relief, judgment on the pleadings may be appropriate. *See generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

## II.    The Commissioner's Decision to Deny Benefits was Supported by Substantial Evidence in the Record

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims.[6]  (Tr. 10-20).  Under step one of the process, the ALJ found that Hamilton did not engage in substantial gainful activity since December 17, 2009, the application date.  (Tr. 12).  At step two, the ALJ concluded that Hamilton has the severe impairments of obesity, mild disc disease of the cervical spine, chronic low back pain without disc changes, and status post injury of the left foot, but that Hamilton's other impairments – including asthma, migraine headaches, gastroesophageal reflux disease, dysthmic disorder and obsessive-compulsive personality disorder – were nonsevere.  (Tr. 12-14).  At step three, the ALJ determined that Hamilton does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments.  (Tr. 15).  At step four, the ALJ concluded that Hamilton had the residual functional capacity ("RFC") to perform the full range of sedentary work and that Hamilton is

---

[6]  The five-steps are:

> (1)    whether the claimant is currently engaged in substantial gainful activity;
>
> (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)    if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v)

capable of performing past relevant work as a census worker. (Tr. 15-19). The ALJ alternatively determined at step five of the analysis that considering Hamilton's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Hamilton can perform. (Tr. 19-20). Accordingly, the ALJ found that Hamilton is not disabled.

### III.  **Hamilton's Arguments**

In her brief, Hamilton challenges the ALJ's decision on the following bases: (1) the ALJ failed to properly assess Hamilton's mental impairments, erred in failing to find that said impairments are severe and erred in failing to find any limitations from those impairments; (2) the ALJ failed to properly consider and assess the opinions of record with respect to Hamilton's physical impairments; and, (3) the ALJ failed to properly consider the combination of Hamilton's severe and nonsevere limitations. (Docket # 9-1 at 5-14).

At oral argument, counsel for Hamilton amplified her argument regarding the ALJ's failure to indicate what weight, if any, was given to Dr. Magurno's evaluation. According to Hamilton's counsel, Dr. Magurno opined that Hamilton would have moderate schedule disruptions because of her migraine headaches. Hamilton's counsel argued that this opinion was not contradicted by any record evidence, should have been credited and would have required testimony from a vocational expert as to whether, despite the disruptions, jobs existed in the national economy which Hamilton could perform on a regular and continuing basis.

A.    **The ALJ Properly Determined that Hamilton's Mental Conditions are "Not Severe" Impairments**

Hamilton contends that the ALJ improperly concluded that Hamilton's mental impairments are not severe.  (Docket # 9-1 at 7).  The ALJ determined that Hamilton's mental impairments of dysthmic disorder and obsessive compulsive personality disorder are not "severe" impairments because they "are such slight abnormalities that they would have only a minimal effect on [Hamilton's] ability . . . to engage in work activity."  (Tr. 12).  This finding is supported by substantial evidence in the record.

Courts have held that step two of the five-part analysis is limited to "screen[ing] out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  Severity turns on a claimant's ability to do "basic work activities," which include, with respect to mental function, "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and, "[d]ealing with changes in a routine work setting."  20 C.F.R. 416.921(b)(3-6).  A plaintiff has the burden "to establish the existence of a sufficiently severe impairment to meet the requirements at step two."  *Pennay v. Astrue*, 2007 WL 5465987, *8 (N.D.N.Y. 2007), *report and recommendation adopted*, 2008 WL 4069114 (N.D.N.Y. 2008).  The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, itself, sufficient to deem a condition severe.  *McConnell v. Astrue*, 2008 WL 833968, *2 (N.D.N.Y. 2008) (internal quotation omitted).

Here, the ALJ's finding is supported by the opinion of NP Baltimore, who explicitly opined on two occasions that Hamilton had no limitations in work-related mental functioning.  (Tr. 312, 426).  In her medical examination report of January 12, 2010, NP

Baltimore found no evidence of limitations in Hamilton's ability to understand and remember instructions, carry out instructions, maintain attention and concentration, make simple decisions, interact appropriately with others, maintain socially appropriate behavior without exhibiting behavior extremes, maintain basic standards of personal hygiene and grooming, and function in a work setting at a consistent pace. (Tr. 312). Similarly, in her treatment notes of August 9, 2010, NP Baltimore noted that "mentally [Hamilton] is not limited from working." (Tr. 426).

Moreover, the Court finds that the ALJ did not err in affording little weight to the opinion of treating physician Dr. Povanda, an acceptable medical source under the regulations. Under the regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence"). "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must explicitly consider:

> (1) the frequency of examination and length, nature, and extent of the treatment relationship,
> (2) the evidence in support of the physician's opinion,
> (3) the consistency of the opinion with the record as a whole,
> (4) whether the opinion is from a specialist, and
> (5) whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199.  The regulations also direct that the ALJ

should "give good reasons in [her] notice of determination or decision for the weight [she]

give[s] [claimant's] treating source's opinion."  *Halloran v. Barnhart*, 362 F.3d at 32 (alterations

in original) (quoting 20 C.F.R. § 404.1527(d)(2)).

        As an initial matter, it is not clear that Dr. Povanda may be considered a treating

physician because Hamilton testified that the first time she was examined by Dr. Povanda was

when he completed her disability paperwork.  *See Redmond v. Astrue*, 2009 WL 2383026, *7

(N.D.N.Y. 2009) (doctor was not a treating physician and not entitled to controlling weight

where it "appear[ed] that he only examined [p]laintiff on one occasion"); *Sapienza v. Shalala*,

894 F. Supp. 728, 733 (S.D.N.Y. 1995) ("[t]he administrative record provides substantial support

for the ALJ's conclusion that Dr. Shafer was not a treating physician[;] [t]he record indicates that

[he] had examined [plaintiff] only once").  Even assuming Dr. Povanda should be entitled to

treating physician status, the ALJ applied the factors set forth above and concluded that Dr.

Povanda was not actively treating Hamilton, that his conclusions regarding Hamilton's mental

impairments directly conflicted with NP Baltimore's conclusions and that his conclusions

regarding Hamilton's physical limitations were inconsistent, both internally and with the record

as whole.  Accordingly, the ALJ properly rejected Dr. Povanda's opinions regarding Hamilton's

mental impairments and properly adopted his opinions regarding her physical limitations only to

the extent they were consistent with a finding of ability to perform sedentary work.  *See Brazier*

*v. Astrue*, 2011 WL 5104477, *4-6 (D. Vt. 2011) (ALJ correctly determined that treating

physician was not entitled to controlling weight and gave good reasons for affording limited

weight to the doctor's opinions); *Bennett v. Astrue*, 2010 WL 3909530, *4-6 (N.D.N.Y. 2010)

("[t]he less consistent an opinion is with the record as a whole, the less weight it is to be given[;] . . . the ALJ articulated 'good reasons' for failing to afford the opinions [controlling] weight . . . [and] the Court finds that substantial evidence exists to support the ALJ's decision to afford 'minimal weight' to his assessments").

I also conclude that the ALJ properly afforded significant weight to NP Baltimore despite the fact that she is a non-acceptable medical source under the regulations. The Social Security regulations provide that "[m]edical opinions are statements from physicians and psychologists or other *acceptable medical sources* that reflect judgments about the nature and severity of . . . impairment(s)." *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995) (quoting 20 C.F.R. § 404.1527(a)(2)). Nurse practitioners, on the other hand, are expressly listed in a separate section, under "other sources" whose "[i]nformation ... may . . . help us to understand how [the] impairment affects your ability to work." *Id.* (quoting 20 C.F.R. § 404.1513(e) (1994)). Although opinions from nurse practitioners are not considered "acceptable medical sources," such opinions are nevertheless "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-03p, 2006 WL 2329939, *3 (Aug. 9, 2006). Moreover, "[b]ased on the particular facts of a case, such as length of treatment, it may be appropriate for an ALJ to give more weight to a non-acceptable medical source than a treating physician." *Anderson v. Astrue*, 2009 WL 2824584, *9 (E.D.N.Y. 2009).

In this case, the ALJ properly found NP Baltimore's opinion "most probative" considering that she had the longest treatment history with Hamilton and had been her primary provider of mental health treatment. *See Barry v. Astrue*, 2010 WL 3168630, *11 (D. Ariz. 2010) ("the opinion of a nurse practitioner may be given more weight than that of even a treating

source if the nurse practitioner 'has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation of his or her opinion'") (quoting Social Security Ruling 06-03p, 2006 WL 2329939 (Aug. 9, 2006)).  The record reflects that Hamilton talked to NP Baltimore about her mental health issues; in fact, Hamilton testified at her administrative hearing that she preferred to receive treatment from NP Baltimore rather than from Family Services.  (Tr. 13, 45-46).  Further, the record reflects that Hamilton saw NP Baltimore at least seventeen times between May 2009 and August 2010, but saw Dr. Povanda only once.  (Tr. 18, 46-47, 314-17, 423-42).

Furthermore, NP Baltimore's opinion was well-supported by the objective evidence in the record and was consistent with the medical opinion of consultative examiner Dr. Long.  (Tr. 372-76).  Specifically, Dr. Long performed a mental examination of Hamilton and made the following assessment:  Hamilton was cooperative and had good social skills; Hamilton's speech was fluent and clear with adequate and receptive and expressive language; Hamilton was coherent and goal directed, and had no indication of any sensory or thought disorder; Hamilton displayed a full range of appropriate affect in speech and thought content; Hamilton's mood was euthymic; and, Hamilton was well-oriented and appeared to be functioning on an average intellectual level with "somewhat limited fund of information."  (Tr. 374).  Although Dr. Long opined that Hamilton's insight was "poor," her judgment was "fair to poor" and that Hamilton had psychiatric problems, she also determined that Hamilton is able to follow and understand simple directions and to perform simple tasks independently, is able to maintain attention, concentration and a regular schedule, appears to be able to learn new tasks, perform complex tasks independently, and make appropriate decisions within context, and appears able to

relate adequately with others and to have adequate stress management skills, although Dr. Long

noted that Hamilton avoids conflict.  (Tr. 375).

With respect to Hamilton's contention that "[t]he ALJ's failure to discuss or

provide any weight to [Hamilton's] GAF in and of itself warrants remand," the Court finds this

argument meritless for several reasons.  (Docket # 9-1 at 8).  First, Hamilton cites no legal

authority supporting this contention, nor is the Court aware of any such authority.  Indeed, cases

within this Circuit have held that an ALJ's failure to discuss GAF scores does not mandate

remand.  *See*, *e.g.*, *Ortiz Torres v. Colvin*, 2013 WL 1500470, *10 (N.D.N.Y. 2013) ("GAF score

[is] but 'one factor' that a hearing officer ought to consider in his determination[;] . . . [t]his

Court rules that the hearing officer's failure to discuss the scores does not constitute an error

worthy of remand") (citing *Carrigan v. Astrue*, 2011 WL 4372651, *10 (D. Vt.), *report and

recommendation adopted*, 2011 WL 4372494 (D. Vt. 2011); *Howard v. Comm'r of Soc. Sec.*,

276 F.3d 235, 241 (6th Cir. 2002) ("failure to reference the GAF score in the [RFC assessment],

standing alone, does not make the [RFC] inaccurate")).  Second, as defendant correctly points out

(Docket # 11-1 at 19-20), Hamilton's GAF score of 50 was based on her functioning on the date

of intake, not over an extended period of time.[7]  Accordingly, any error in failing to explicitly

address the GAF score was harmless.  *See McKinstry v. Astrue*, 2012 WL 619112, *4 (D. Vt.

2012), *aff'd*, 2013 WL 535801 (2d Cir. 2013) ("[f]ailure to address evidence is harmless error if

consideration of the evidence would not have changed the ALJ's ultimate conclusion"); *see also

Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (holding that it was harmless error where

---

[7] Hamilton's discharge records also indicate a GAF score of 50, likely due to the fact that Hamilton was non-compliant with treatment, repeatedly failed to attend scheduled appointments and thus made no documented progress with respect to her stated goals.  (Tr. 286).

there was "no reasonable likelihood that [the ALJ's] consideration of the . . . doctor's . . . report would have changed the ALJ's determination that [the plaintiff] was not disabled during the closed period").

Finally, the Court finds no merit in Hamilton's argument that the ALJ erred in applying the "special technique" applicable to mental impairments. (Docket # 9-1 at 9). An ALJ's evaluation of a claimant's mental impairments must reflect his application of the "special technique" set out in 20 C.F.R. § 404.1520a, which necessitates his consideration of "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). The first three areas are rated on a five-point scale – [n]one, mild, moderate, marked, and extreme. *Id.* at § 404.1520a(c)(4). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the [ALJ] generally will conclude that the claimant's mental impairment is not 'severe.'" *Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1520a(d)(1)). Here, the ALJ discussed each factor and cited particular exhibits in the record in support of each of these considerations. (Tr. 14).

First, in activities of daily living, the ALJ found that Hamilton has mild restriction due to her mental impairments. In support of this determination, the ALJ noted Dr. Long's report that Hamilton was "neat and well groomed" and that Hamilton reported to her that she does cooking and cleaning, which is "limited only by perceived pain and not psychological issues." (*Id.*). The ALJ also noted Hamilton's ability to care for her personal needs and to go shopping once a month.

Second, regarding social functioning, the ALJ concluded that Hamilton has mild limitation. The ALJ's determination was supported by Dr. Long's report that Hamilton was "cooperative with good social skills" and "appears able to relate adequately to others and to have adequate stress management skills," even though Hamilton avoids conflict. (*Id.*).

Third, with respect to concentration, persistence, or pace, the ALJ determined that Hamilton has mild limitation. (*Id.*). The ALJ supported this determination with Dr. Long's report that Hamilton was able to follow and understand simple directions and instructions, to perform simple tasks independently, and to maintain attention, concentration, and a regular schedule. The ALJ also noted Hamilton's apparent ability to learn new tasks, perform complex tasks independently and make appropriate decisions within context. (*Id.*). To the extent Hamilton argues that the ALJ erred in relying on Dr. Long's opinion because it was contrary to the opinion of treating physician Dr. Povanda, this contention is meritless. (Docket # 9-1 at 10-11). As discussed *supra*, Dr. Povanda's opinion was properly discounted by the ALJ because his opinion was inconsistent with the other substantial evidence in the record. Further, Dr. Povanda saw Hamilton only once – the day he completed her disability paperwork. (Tr. 18, 47).

Next, the ALJ noted that Hamilton has experienced no known episodes of decompensation for an extended duration. (Tr. 14).

Accordingly, the ALJ properly determined that Hamilton had only mild limitations in each of the first three areas and no episodes of decompensation for an extended duration and thus found that Hamilton's mental impairments were not severe. *See Agudo-Martinez v. Barnhart*, 413 F. Supp. 2d 199, 210-11 (W.D.N.Y. 2006) (substantial

evidence supported ALJ's determination that plaintiff suffered only a nonsevere mental limitation).

For these reasons, I reject Hamilton's first argument.

**B.     The ALJ Properly Considered and Assessed the Record Evidence in Arriving at Hamilton's RFC**

Hamilton argues that the ALJ failed to properly consider and assess all of the record evidence in arriving at Hamilton's RFC. Specifically, Hamilton argues that the ALJ erred by failing to consider NP Baltimore's opinion regarding her physical limitations and subjective complaints of back pain. (Docket # 9-1 at 11-12). The ALJ determined that Hamilton has the RFC to perform the full range of sedentary work (Tr. 15) – a determination that is supported by substantial evidence in the record.

In assessing a claimant's RFC, the ALJ must consider all the relevant medical and other evidence in the case record to assess the claimant's ability to meet the physical, mental, sensory and other requirements of work. 20 C.F.R. § 404.1545(a)(3)-(4). It is within the province of the ALJ to weigh conflicting evidence in the record and credit that which is more persuasive and consistent with the record as a whole. *See, e.g.*, *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002) ("[g]enuine conflicts in the medical evidence are for the Commissioner to resolve") (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)); *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("[i]t is for the SSA, and not this court, to weigh the conflicting evidence in the record").

Here, the ALJ concluded that Hamilton had the ability to perform a full range of sedentary work. (Tr. 15). Sedentary work involves lifting no more than ten pounds and involves

limited walking or standing.  20 C.F.R. § 404.1567(a).  The ALJ based this conclusion on his review of all of the relevant medical evidence, as well as his evaluation of Hamilton's subjective complaints.

Specifically, the ALJ credited NP Baltimore's opinion concerning Hamilton's physical limitations, except for Hamilton's ability to use her hands because, as the ALJ noted, that opinion was not supported by the objective evidence.  (Tr. 19).  In her medical examination assessment of January 12, 2010, NP Baltimore opined that Hamilton was not limited in sitting, but was "very limited" in her ability to stand, walk, push, pull, bend and climb.  (Tr. 312).  These limitations are consistent with sedentary work, which involves lifting no more than ten pounds and limited walking and standing.  *See* 20 C.F.R. § 404.1567(a).  The portion of NP Baltimore's opinion regarding Hamilton's ability to use her hands (that she was "moderately limited" in using her hands) was unsupported by evidence and therefore properly discounted by the ALJ.  *See Veino v. Barnhart*, 312 F.3d at 588 (ALJ has discretion to accept or reject portions of opinion based upon substantial evidence in the record).  For example, as noted by the ALJ, Hamilton herself identified no impairments that would reasonably interfere with the use of her hands and arms.  (Tr. 19).  Additionally, on March 9, 2010, consultative examiner Dr. Magurno assessed that Hamilton's grip strength was 5/5 bilaterally and her hand and finger dexterity were intact. (Tr. 382).  And, in her medical source statement, Dr. Magurno opined that Hamilton had no limitations for fine motor activities.  (Tr. 383).  Further, the treatment notes from Hamilton's physical assessment at Elmira Orthopedics reveal that Hamilton demonstrated full range of motion and strength in her wrists and hands.  (Tr. 472).  Accordingly, the ALJ properly

considered NP Baltimore's opinion regarding Hamilton's physical limitations and appropriately afforded more weight to those portions of her opinion that were consistent with the record.

With respect to Hamilton's argument that the ALJ overlooked Hamilton's subjective complaints of chronic low back pain, the Court rejects this contention. (Docket # 9-1 at 12). Although the ALJ is required to consider Hamilton's subjective complaints of pain, 20 C.F.R. §§ 404.1529(a), (c), 416.929(a), (c), he is "not obliged to accept without question the credibility of such subjective evidence." *Blandford v. Apfel*, 69 F. Supp. 2d 353, 359 (N.D.N.Y. 1999) (quoting *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)); *Peterson v. Gardner*, 391 F.2d 208, 209 (2d Cir. 1968) (*per curiam*); *Spicer v. Califano*, 461 F. Supp. 40, 47-48 (N.D.N.Y. 1978). "There must be objective medical evidence which demonstrates that the claimant has a medical impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Blanford v. Apfel*, 69 F. Supp. 2d at 359 (citing §§ 404.1529(a), 416.929(a)).

In this case, the ALJ properly considered Hamilton's complaints of chronic low back pain, but discounted them to the extent they were not corroborated by the objective evidence. (Tr. 16-17). For instance, as the ALJ noted, although Hamilton claimed she had suffered chronic back pain since 2004, she did not complain of any back pain to her doctors until December 23, 2009, after she filed her disability claim. (Tr. 17, 48-50, 314). Additionally, Hamilton's lumbar MRI report from 2005 showed no disc herniations. (Tr. 17, 465).

Finally, the Court rejects Hamilton's argument that the ALJ erred "in completely ignoring and/or failing to indicate what weight is given to opinions of record" and "never indicates what, if any, weight is given to the opinion of . . . Dr. Magurno, and certainly never gives any indication what, if any, weight is given to the opinion of the actual testing." (Docket

# 9-1 at 13).  Although the ALJ did not explicitly assign a weight to Dr. Magurno's opinion or the functional assessment performed by Elmira Orthopedics, the ALJ provided a summary of both and specifically referred to the corresponding exhibits in his decision.  (Tr. 16).  In any event, the functional assessment completed by Elmira Orthopedics is consistent with sedentary work and supports his RFC determination; any error is thus harmless.  *See Jones v. Barnhart*, 2003 WL 941722, *10 (S.D.N.Y. 2003) (the ALJ's failure to explain the weight that he gave to the opinions of plaintiff's other treating physicians constitutes harmless error because "he engaged in a detailed discussion of their findings . . . and his decision does not conflict with them"); *see also Pease v. Astrue*, 2008 WL 4371779, *8 (N.D.N.Y. 2008) ("[t]he ALJ provided a detailed summary and analysis of the reports and records of all treating and examining physicians[;] . . . [t]herefore, the ALJ's failure to comment on the weight of evidence was harmless error, and does not provide a basis for a remand to the Commissioner") (citations omitted).

With respect to Dr. Magurno's evaluation, Hamilton claims that the ALJ's failure to assess the opinion was not harmless because Dr. Magurno's conclusion that Hamilton would experience "moderate schedule disruptions due to her migraines" conflicted with the ALJ's RFC assessment.  Hamilton contends that Dr. Magurno's opinion, if credited, would have required testimony from a vocational expert to determine whether the disruptions would impact Hamilton's ability to sustain employment on a regular and continuing basis.  Further, according to Hamilton, Dr. Magurno's conclusion should be credited because there was no evidence in the record to contradict the conclusion that Hamilton's migraines would disrupt her schedule.

As an initial matter, an ALJ need not "reconcile explicitly every conflicting shred of medical testimony." *Zabala v. Astrue*, 595 F.3d at 410 (quoting *Fiorello v. Heckler*, 725 F.2d 174 (2d Cir. 1983)). In this case, ample evidence existed in the record to contradict Dr. Magurno's conclusion that Hamilton's migraines would cause schedule disruptions. The ALJ discussed in detail Hamilton's complaints regarding her migraine headaches. (Tr. 12-13). The ALJ reviewed Dr. Schuman's treatment notes that indicated that Hamilton's EEG, MRI and CT revealed no abnormalities. Further, the ALJ noted that Dr. Schuman's report found that Hamilton could "function without restriction," that her headaches were "self-limited" and that "no medications were taken." (Tr. 13). Finally, the ALJ discussed Hamilton's testimony regarding the frequency of her headaches and concluded that she exaggerated the frequency. (Tr. 13, 17).

In any event, I conclude that the ALJ implicitly rejected Dr. Magurno's opinion regarding Hamilton's migraines when he determined that Hamilton's migraines were not severe. In his determination, the ALJ discussed Dr. Magurno's opinion and noted that Hamilton reported her complaints of migraines to Dr. Magurno. (Tr. 16). Specifically, during the evaluation, Hamilton told Dr. Magurno that she experienced migraines four times per week. The ALJ rejected Hamilton's contention that she experienced migraines with such frequency. (Tr. 17). The opinion proffered by Dr. Magurno, who only examined Hamilton on a single occasion, appears to have been based upon Hamilton's subjective reports of the frequency and severity of

her migraines.[8]  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (ALJ properly gave no weight to consultative examiner's opinion that claimant's ability to participate in gainful employment was limited by her recurrent and severe migraines where examiner "did not have a treating relationship with [claimant], he based his opinion on a single, subjective report given to him by [claimant] and his opinion was not supported by the evidence of record").  Because the ALJ explicitly rejected Hamilton's statements regarding the frequency and severity of her migraines and determined they were not severe, he implicitly rejected Dr. Magurno's opinion that her migraines would cause moderate schedule disruptions; his failure to explicitly reject the opinion does not require remand.  *See Bruner v. Comm'r of Soc. Sec.*, 2009 WL 3052291, *25 (M.D. Fla. 2009) ("by implication the ALJ rejected [the consultative opinion] because [it was] contrary to his finding that [c]laimant's mental impairments are not severe[;] . . . the ALJ did not err by implicitly rejecting the opinion . . . because substantial evidence supports the ALJ's finding that claimant's mental impairments were not severe"); *Boles v. Astrue*, 2008 WL 2952467, *8 (E.D. Tenn. 2008) (concluding ALJ's failure to discuss reasons for discounting medical report did not require remand where review of ALJ's decision mandated conclusion that

---

[8]  The report provides:

> [Hamilton] says [her neck pain] is [as] severe as 6 out of 10 and causes migraines which she gets four times a week.  If she catches them early, they last about one hour and if not they may last up to four to five hours.  If they last long, there is associated nausea as well as light sensitivity and sensitivity to noise and smells.  She has had migraines since she was a teenager, but they have been much worse since the automobile accident.

(Tr. 378).  The report does not indicate that Dr. Magurno reviewed Hamilton's medical records in connection with her examination or her report, other than a spine x-ray that was performed in connection with the examination. (Tr. 384).

"he must have considered and rejected [the doctor's opinion;] . . . [u]nder certain circumstances, the failure of an ALJ to mention the report of a treating physician is harmless error").

Accordingly, the Court finds no error and rejects Hamilton's second argument.

**C.  The ALJ Properly Considered the Combination of Hamilton's Severe and Nonsevere Limitations**

Hamilton argues that the ALJ failed to consider the combined effect of her severe and nonsevere limitations when determining Hamilton's RFC.  Specifically, she claims that the ALJ failed to consider her mental disorders in connection with her physical limitations.  (Docket # 9-1 at 13-14).  The Court finds this argument meritless.

The ALJ is required to consider the "combined effect of all of [plaintiff's] impairments without regard to whether any such impairment, if considered separately would be of sufficient severity."  20 C.F.R. § 404.1523; *see Dixon v. Shalala*, 54 F.3d at 1031 ("the combined effect of a claimant's impairments must be considered in determining disability; the SSA must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe").

In this case, the record clearly reflects that the ALJ engaged in a thorough discussion of Hamilton's mental and physical impairments and the combined effect they have on her ability to work.  (Tr. 15-19).  The ALJ's RFC finding, as discussed *supra*, takes into account Hamilton's physical and mental impairments and her associated limitations, and that finding is supported by substantial evidence in the record.

With respect to Hamilton's argument that the ALJ failed to consider the side effects of Hamilton's medications – particularly Flexeril that she claims causes drowsiness – in

assessing her RFC (Docket # 9-1 at 15), the Court rejects this argument. Indeed, pursuant to 20

C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(G), the ALJ must give attention to the effects of

medication on a claimant's symptoms, signs and ability to function. Here, contrary to

Hamilton's contention, the ALJ's decision reflects that he considered Hamilton's medication and

side effects. (Tr. 17). As the ALJ noted, although Hamilton testified at the hearing that she

suffered drowsiness as a result of her medications, her medical records contained no such reports.

(*Id.*). Accordingly, the ALJ considered and rejected Hamilton's subjective complaints. *See*

*Brockway v. Barnhart*, 94 F. App'x 25, 28-29 (2d Cir. 2004) ("medical reports do not reflect any

complaints by [plaintiff] about the effects of these medications").

Accordingly, the Court also rejects Hamilton's third argument.


## CONCLUSION

After careful review of the entire record, this Court finds that the Commissioner's

denial of SSI was based on substantial evidence and was not erroneous as a matter of law.

Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's

motion for judgment on the pleadings **(Docket # 11)** is **GRANTED**. Hamilton's motion for

judgment on the pleadings **(Docket # 9)** is **DENIED**, and Hamilton's complaint (Docket # 1) is

dismissed with prejudice.

**IT IS SO ORDERED.**

    *s/Marian W. Payson*
    MARIAN W. PAYSON
    United States Magistrate Judge

Dated: Rochester, New York
    September   30  , 2013